```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
                       WESTERN DIVISION
```

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 18-cr-20033-JTF** |
| | ) | |
| **ANDRES REGALADO,** | ) | |
| | ) | |
|     **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Before the undersigned by order of reference are defendant Andres Regalado's motion to sever and motion to suppress. (ECF Nos. 303, 304, & 306.) The undersigned conducted a hearing on the motions. For the following reasons, it is recommended that both motions be denied.

### I.    PROPOSED FINDINGS OF FACT

The present motions stem from two search warrants. The first search warrant was approved by the undersigned and sought historical cell site information from T-Mobile USA regarding a subscriber using a phone number ending with 4568 ("the T-Mobile warrant"). The second search warrant was approved by a federal magistrate judge sitting in the United States District Court for the Central District of California and sought non-narcotic evidence of drug distribution (commonly referred to as a document search warrant) at a residence at 16734 Crenshaw Boulevard, in

Torrance, California ("the Crenshaw warrant"). The following findings of fact are based on the information contained within the four corners of each warrant application.

In the affidavit supporting the application for the T-Mobile warrant, Special Agent Peter W. Maher of the federal Drug Enforcement Administration ("DEA") stated that in 2017, the DEA and the United States Postal Inspection Service ("USPIS") began investigating an "interstate criminal organization responsible for trafficking multi-pound quantities of methamphetamine" from Los Angeles to Memphis. Agent Maher went on to state:

> During the course of this investigation, through the use of video surveillance footage obtained by federal investigators with the USPIS — Memphis Field Office and resulting interviews with a cooperating defendant, as well as corroborating information from official state records, investigators identified [Named Informant One], a resident of Los Angeles, as the individual responsible for shipping one or more parcels containing crystal methamphetamine via the United States Postal Service from California to Tennessee. Based on a review of postal records, investigators determined [Named Informant One's] organization shipped multiple packages from the Los Angeles, CA area to Memphis, TN, from September 29, 2016 to August 15, 2017. Federal law enforcement officials in Tennessee successfully intercepted multiple parcels in 2017 and each of the packages contained controlled substances, including methamphetamine.

The warrant application stated that in February 2018, six individuals, including Named Informant One and Named Informant Two, were indicted by a grand jury in the Western District of Tennessee for various drug offenses and were arrested. Agent Maher

-2-

explained in his affidavit that:

> Through subsequent investigation, namely through the cooperation of two cooperating defendants in the investigation, as well as corroborating telephonic subscriber and toll records, investigators have identified [Named Informant One's] methamphetamine source of supply as Andres Regalado a.k.a. "Andy," who provided this organization with the methamphetamine that was ultimately seized in Memphis by investigators. . . .
>
> During the course of a proffer interview, [Named Informant One] provided the Subject Phone as one of Regalado's telephone numbers. Investigators subsequently obtained telephonic subscriber information for this telephone number pursuant to the service of administrative subpoenas. Telephone number [ending in 4568] was subscribed to [Named Individual] at 3751 W. 106th Street, Inglewood, California 90303. Through prior investigation, investigators believe [Named Individual] is Regalado's past or current girlfriend and/or co-resident.
>
> Investigators subsequently served CarMax with an administrative subpoena about Regalado, [Named Individual], and their vehicle. On June 25, 2018, the investigative case team received an official response from CarMax via e-mail. Between June 25, 2018 and July 1, 2018, the investigative case team reviewed and analyzed this response. This response included a photocopy of a personal check addressed to "CarMax" from "[a name similar to that of Named Individual]" (a documented alias and suspected maiden name for [Named Individual]) at 3751 W. 106th Street, Inglewood, California, 90303 (the same address as [Named Individual's] telephone subscriber information[)]. On this personal check, made out in the amount of $1,600, the memorandum section lists: "Andy's Down Payment." Both [Named Informants One and Two] have both repeatedly identified "Andy" as a known alias/moniker for Regalado.
>
> Further, this administrative subpoena response also includes Regalado's full name, driver's license number . . . and his shared address with [Named Individual][.]

-3-

> Additionally, next to Regalado's official signature, Regalado has documented his telephone number as [the 4568 number], the same telephone number [Named Informant One] provided as Regalado's telephone number. The telephone number is repeatedly listed throughout this documentation as Regalado's telephone number.

Agent Maher explained that investigators were attempting to corroborate the locations of Named Informant One's meetings with Regalado. Agent Maher went on to state that cell phone companies such as T-Mobile gather information about the approximate locations of the telephones they service and compile that data into historical cell site records. Based on this information, the undersigned authorized a warrant for historical cell site data and certain other non-content subscriber information on July 5, 2018.

In the affidavit supporting the application for the Crenshaw warrant, Special Agent Courtney L. Boekman of the DEA, like agent Maher before her, stated that in 2017, the DEA and the USPIS began investigating a "interstate criminal organization responsible for trafficking multi-pound quantities of methamphetamine" from Los Angeles to Memphis. Agent Boekman then went into greater depth on the investigation:

> Law enforcement intercepted two packages or about March 16, 2017 and a third package on or about July 8, 2017, containing approximately one half-pound of methamphetamine each. The methamphetamine was lab-tested and confirmed to be 99% pure methamphetamine. The packages were sent through the United States Postal Service to addresses in Tennessee, including an address that law enforcement identified as belonging to

-4-

[Indicted Conspirator One] through law enforcement databases. In July 2018, law enforcement did a controlled delivery of the third package, which was addressed to [Indicted Conspirator One], and arrested [Named Informant Two] when [Named Informant Two] went to pick up the package from the residential building's office. [Named Informant Two] identified himself as [Indicted Conspirator One's] boyfriend to law enforcement following his arrest.

Postal surveillance video showed an individual shipping each of the above-described packages. By looking at [Named Informant Two's] social media pages, law enforcement were able to recognize an individual in one of the photographs as the same individual seen in the postal surveillance video. [Named Informant Two] identified the individual as [Named Informant One], who resides in California.

A review of postal records revealed that from approximately late 2016 to August 2017, [Named Informant One] and suspected co-conspirators had repeatedly shipped parcels to addresses in Tennessee, including addresses identified as belonging to [Named Informant Two] and [Indicted Conspirator One] through surveillance and law enforcement databases. In addition to seizing methamphetamine shipped by [Named Informant One] to Tennessee, law enforcement also successfully seized shipments of illegally diverted pharmaceutical opioids and marijuana. During the course of a controlled delivery operation, law enforcement also seized drug proceeds. . . .

Following his arrest, [Named Informant One] began providing information about his source of methamphetamine supply through proffer interviews.

[Named Informant One] stated that he shipped parcels containing large quantities of prescription pills to [Named Informant Two] and another co-defendant, but began to ship methamphetamine after being asked if [Named Informant One] had access to the drug. [Named Informant One] successfully began to obtain methamphetamine from an individual that he knew as "Andy" (later identified by law enforcement as Regalado)

-5-

in packages physically packaged by Regalado. After a series of shipments, [Named Informant One] began to purchase pound-quantities of crystal methamphetamine from Regalado for $3,200 per pound. [Named Informant One] would receive the methamphetamine at Regalado's residence, which at the time was on Lennox Blvd in Inglewood, California (the "Lennox Boulevard address").

The Los Angeles, California office of the DEA previously investigated Regalado's activities from 2013-2016. This investigation resulted in the seizure of a multi-kilogram quantity of cocaine and a multi-pound quantity of methamphetamine that was coordinated by Regalado. During the course of the undercover investigation targeting Regalado, Regalado informed an undercover DEA Special Agent that he preferred to conduct narcotics transactions at his own residence, consistent with his dealings with [Named Informant One].

After receiving the methamphetamine from Regalado, [Named Informant One] said that he would store the methamphetamine at [Named Informant One's] residence, where [Named Informant One] would divide the drugs into smaller quantities for subsequent interstate distribution. In return, [Named Informant Two] and another co-defendant would fly to California with drug proceeds to purchase more methamphetamine. Further, [Named Informant Two] and the other co-defendant would also ship parcels of drug proceeds (in bulk United States currency) to [Named Informant Two's] residence in Los Angeles. Finally, {Named Informant One] gave his Memphis-based co-conspirators the banking information for an individual [Named Informant One] believed was Regalado's girlfriend (later identified as [Named Individual One], as further described below), so that the Memphis conspirators could pay Regalado for drugs through bank deposits. [Named Informant One] stated that he had previously seen Regalado's girlfriend at Regalado's house.

[Named Informant One] stated that he was paid at least $15,000 from methamphetamine sales over the course of the multi-year conspiracy. [Named Informant One] also stated that Regalado would deliver the methamphetamine to him in a brown sedan. [Named Informant One] said he

-6-

believed the sedan had a hidden compartment based on discussion [Named Informant One] had with Regalado, and that the hidden compartment is used to transport and hide drugs. [Named Informant One] did not know where the hidden compartment was located in the car.

Furthermore, [Named Informant One] stated that on or about April 19, 2018, Regalado came to [Named Informant One's] house unannounced to ask [Named Informant One] for money owed to Regalado for methamphetamine. Regalado had provided [Named Informant One] two pounds of methamphetamine, worth $6,000, without asking for prior payment. However, the methamphetamine had been seized by law enforcement in Memphis. [Named Informant One] believed that Regalado owed another individual money for the methamphetamine Regalado had provided to [Named Informant One]. After [Named Informant One] told Regalado that [Named Informant One] had been arrested on federal charges in Memphis however, Regalado no longer appeared interested in the debt, and [Named Informant One] has not heard from Regalado since that conversation.

[Named Informant One] further told law enforcement that he knows Regalado to possess a 9mm pistol, which Regalado kept in his house next to his chair. [Named Informant One] said that Regalado drove a brown car, possibly a Honda, with a California license plate number of 7XJL306 (later identified as the Subject Vehicle, as described below). [Named Informant One] wrote down the license plate number after Regalado visited him on April 19, 2018 to collect money.

California DMV records for the license plate number provided by [Named Informant One] show that it belongs to a 2015 Nissan Altima (the Subject Vehicle) registered to Regalado and [Named Individual One], at an apartment located at the Lennox Boulevard address. This is the same location that [Named Informant One] identified as being Regalado's residence, and where [Named Informant One] would get methamphetamine from Regalado.

A criminal history check for Regalado shows an extensive criminal history that includes multiple drug, firearms, and violent offenses, including robbery, firearms

-7-

possession, and spousal battery. He is also documented as a suspected gang member.

DEA created an official DEA photographic line-up, which included a photograph of Andres Regalado obtained through law enforcement databases. [Named Informant One] positively identified the photograph of Regalado as "Andy," his source of methamphetamine supply. Similarly, [Named Informant Two] – who, according to [Named Informant One], had taken [Named Informant Two][1] to Regalado's house to purchase drugs – identified a photograph of Regalado as [Named Informant One's] source of supply.

During the course of the proffer interview, [Named Informant One] provided the 4568 phone number as one of the phone numbers he used to contact Regalado. Investigators subsequently obtained subscriber information for this telephone number through administrative subpoenas and found that it was subscribed to [Named Individual One] at an address on W. 106th Street in Inglewood, California.

During a proffer interview in late August 2018, [Named Informant One] was shown the California DMV photograph of [Named Individual One] and positively identified her as Regalado's girlfriend, whose bank accounts [Named Informant One] had provided to Memphis co-conspirators in order to send money for drugs back to Regalado.

On July 5, 2018, the Honorable Tu M. Pham, United States Magistrate Judge for the Western District of Tennessee, authorized the search and seizure of historical cell site records and other information to and from the 4568 phone number. A subsequent review of this data by DEA investigators revealed that the user of this telephone, suspected to be Regalado, was in the same sector of Los Angeles County as [Named Informant One] was located in the 24 hours prior to each of the interdicted methamphetamine shipments, consistent with Regalado's information that he was picking up the drugs from

---

[1]This is presumably a typographical error, as it does not make much sense for Named Informant Two to take himself somewhere to purchase drugs.

-8-

> Regalado for shipment to Tennessee.
>
> Investigators served CarMax with an administrative subpoena about Regalado, [Named Individual One], and the Subject Vehicle. The responsive documents identified the Subject Vehicle as "gold" in color, and included Regalado's full name and his California driver's license number. In addition, next to Regalado's signature. Regalado listed his telephone number as the same 4568 phone number provided by [Named Informant One] . . . .
>
> Database search results and surveillance show that Regalado's residence is currently listed as 16734 Crenshaw Boulevard, Torrance, California 90504 (the "Subject Premises"). For example, Regalado's DMV records list the Subject Premises as Regalado's sole address. Furthermore, law enforcement surveillance conducted throughout July and August of 2018 show that Regalado is using the Subject Premises as his residence. On or about July 10, 2018, investigators saw Regalado at the Subject Premises, and further saw Regalado at the Subject Premises in the same Subject Vehicle previously identified by [Named Informant One] as being driven by Regalado. Law enforcement repeatedly saw the Subject Vehicle at the Subject Premises throughout July and August 2018. In addition, on or about August 23, 2018, investigators again saw Regalado at the Subject Premises.
>
> On August 23, 2018, the Honorable Diane K. Vescovo, United States Magistrate Judge for the Western District of Tennessee, authorized a search and seizure warrant for geo-location information associated with the 4568 phone number believed to be used by Regalado. Consistent with law enforcement's physical surveillance of the Subject Premises, the results of the geo-location warrant provided over the past week have shown that the telephone is frequently located at or near the Subject Premises. Furthermore, for the time the geo-location information has been received for the 4568 phone number, it has not been shown for the Lennox Boulevard address.

Agent Boekman explained that investigators were seeking non-narcotic evidence of Regalado's involvement in the methamphetamine

-9-

distribution ring. Based on this information, a federal magistrate judge sitting in the United States District Court for the Central District of California authorized a warrant to search the Crenshaw Boulevard address on August 31, 2018.

The day before the Crenshaw warrant was issued, a grand jury in the Western District of Tennessee indicted Regalado on one count of conspiracy to distribute and possess methamphetamine, and three counts of distribution and possession of methamphetamine. Regalado was taken into custody shortly afterwards. In April 2019, the grand jury returned a superseding indictment that expanded the date range on the conspiracy count but was otherwise the same as the previous indictment. On October 18, Regalado filed the instant motions to sever and suppress. (ECF No. 303 & 304.) In the motion to sever, Regalado argues the conspiracy charge should be severed from the distribution and possession charges and transferred to a United States District Court in California (presumably the Central District). In the motion to suppress, Regalado argues that both the T-Mobile warrant and the Crenshaw warrant were not supported by probable cause and that the fruits of each search should be suppressed. The government opposes both motions.

## II.   PROPOSED CONCLUSIONS OF LAW

**A.   Motion to Sever**

Under Federal Rule of Criminal Procedure 8(a), an indictment

-10-

"may charge a defendant in separate counts with two or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). However, Federal Rule of Criminal Procedure 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "To prevail on a request for severance the defendant must show compelling, specific, and actual prejudice." Thomas v. United States, 849 F.3d 669, 675 (6th Cir. 2017).

Regalado has not articulated how joinder would be prejudicial within the meaning of Rule 14(a). Instead, in his motion, Regalado provides an analysis of how the conspiracy charge qualifies as a different offense from the distribution and possession charges under the test used to distinguish offenses for purposes of the Double Jeopardy Clause. See generally In re Grand Jury Proceedings, 797 F.2d 1377, 1380 (6th Cir. 1986). This does not address the relevant legal issue. In addition, Regalado conceded at the hearing on this motion that the motion to sever was based on his misunderstanding of the government's allegations. Regalado has thus not shown "compelling, specific, and actual prejudice"

resulting from the joinder of the conspiracy charge with the distribution and possession charges. It is recommended that the motion to sever be denied.

**B.  T-Mobile Warrant**

Regalado next argues that the T-Mobile warrant signed by the undersigned was not supported by probable cause and that the evidence obtained from it should be suppressed.[2]

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause[.]" U.S. Const. amend. IV. To determine if probable cause exists, the task of the issuing judicial officer is "to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238

---

[2]"Federal [c]ourts across the United States have consistently held that a judge who issues a search warrant is not necessarily required to recuse him-or herself from later presiding over matters arising in a subsequent criminal case against an individual who was affected by the search warrant." United States v. Mathis, No. 18CR181DWFLIB, 2018 WL 4473529, at *10 (D. Minn. July 17, 2018), report and recommendation adopted, No. CR18181DWFLIB, 2018 WL 4062741 (D. Minn. Aug. 27, 2018) (collecting cases). This includes the Sixth Circuit. United States v. Lawson, 780 F.2d 535, 540 (6th Cir. 1985); United States v. Murray, 762 F.2d 1013 (6th Cir. 1985).

(1983); see also United States v. Franklin, 622 F. App'x 501, 508 (6th Cir. 2015). "The standard of review for the sufficiency of an affidavit 'is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" United States v. Greene, 250 F.3d 471, 478 (6th Cir. 2001) (quoting United States v. Davidson, 936 F.2d 856, 859 (6th Cir. 1991)); see also United States v. Ugochukwu, 538 F. App'x 674, 678 (6th Cir. 2013). Search warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny. United States v. Baechtle, No. 2:13-cr-20054-SHM, 2015 WL 893348, at *7 (W.D. Tenn. Mar. 2, 2015) (citing United States v. Johnson, 351 F.3d 254, 258 (6th Cir. 2003)). Review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit. United States v. Brooks, 594 F.3d 488, 492 (6th Cir. 2010).

Here, the information presented in the affidavit in support of the T-Mobile warrant is largely based on information provided by two named indicted co-conspirators. "Probable cause for the issuance of a search warrant may be based on an informant's hearsay information, but the issuing judge must have a basis for finding that the informant is reliable, truthful, and in a position to know the information provided." United States v. Goodwin, 552 F.

-13-

App'x 541, 546 (6th Cir. 2014). "These three factors should not be applied rigidly as a test, but should be considered in weighing all of the circumstances." United States v. Gunter, 551 F.3d 472, 479–80 (6th Cir. 2009).

"'An informant's in-person tip is considered to have greater reliability, and therefore to be more supportive of a finding of probable cause, if the affidavit establishes that the name of the informant has been disclosed to the issuing judge.'" Goodwin, 552 F. App'x at 547 (internal alterations omitted) (quoting United States v. May, 399 F.3d 817, 823 (6th Cir. 2005)). "The informant's reliability is grounded on the fact that if the informant's statement is fabricated, he would be subject to criminal liability." Id. Furthermore, "[a]n in-person tip gives the officer an opportunity to observe the informant's demeanor and credibility." Henness v. Bagley, 644 F.3d 308, 318 (6th Cir. 2011). Even if "an affidavit [] supplies little information concerning an informant's reliability," probable cause may still be established if the affidavit supporting a warrant application "includes sufficient corroborating information." United States v. Woosley, 361 F.3d 924, 927 (6th Cir. 2004). One form of corroborating information may be the consistent statements of another informant. Goodwin, 552 F. App'x at 547 ("By telling consistent yet independent stories, informants provide cross-corroboration, and

enhance the reliability of the application as a whole.") (internal alterations, quotations, and citations omitted).

The two informants were co-conspirators in Regalado's drug trafficking conspiracy, giving them a basis of knowledge. Both informants were identified by name to the issuing judge. At least one of the informants provided his or her information in an in-person interview with law enforcement. Both informants provided consistent accounts of Regalado's role as a supplier for the drug trafficking ring, each account corroborating the other. Law enforcement further corroborated certain aspects of those accounts, specifically Regalado's phone number and use of "Andy" as a moniker, through corporate records obtained by administrative subpoenas. This evidence is enough to establish a "fair probability" that Regalado's historical cell site information would show meetings with co-conspirators in the drug trafficking conspiracy. Gates, 462 U.S. at 238. The warrant was supported by probable cause.

Alternatively, even if the warrant were not based on probable cause, exclusion would still not be appropriate because law enforcement's reliance on the warrant was objectively reasonable. See United States v. Leon, 468 U.S. 897, 922 (1984). Regalado argues that the affidavit supporting the warrant application was a "bare bones" affidavit, and that as a result, the good faith

-15-

exception recognized in Leon does not apply. See United States v. Rose, 714 F.3d 362, 367 (6th Cir. 2013). But to qualify as a bare bones affidavit, an affidavit supporting a warrant application "must be *so* lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, *no* reasonable officer would rely on it." United States v. White, 874 F.3d 490, 497 (6th Cir. 2017) (emphasis in original). This does not describe the T-Mobile warrant.

**B.  Crenshaw Warrant**

Regalado next argues that the Crenshaw warrant was invalid. He raises three arguments against the warrant: (1) that the Crenshaw warrant was in part based on information from the T-Mobile warrant, which Regalado contends was invalid; (2) that the warrant did not establish a sufficient nexus between Regalado's past criminal activity and his residence; and (3) that the evidence of Regalado's past criminal activities was stale.

Regalado's first argument can be dealt with quickly. As discussed above, the T-Mobile warrant is supported by probable cause. The Crenshaw warrant is thus not a fruit of a poisonous tree.

Regalado's arguments about nexus and staleness are intertwined. The warrant application only contains evidence about Regalado dealing drugs from his 2017 residence on Lennox Boulevard,

-16-

not evidence that Regalado dealt drugs from his 2018 residence on Crenshaw Boulevard. Regalado argues this means the information in the warrant does not establish a nexus between his Crenshaw house and evidence of drug distribution. Regalado also argues that evidence he dealt drugs in early 2017 was stale by mid-2018.

A "search warrant affidavit must establish a nexus between the place to be searched and the evidence sought." United States v. Elbe, 774 F.3d 885, 889 (6th Cir. 2014) "To meet the nexus requirement the circumstances must indicate why evidence of illegal activity will be found in a particular place." United States v. O'Connor, 723 F. App'x 302, 307 (6th Cir. 2018) (internal quotations, citations, and alterations omitted). Similarly, "[s]tale information may not be used as a basis for probable cause." Elbe, 774 F.3d at 889. Whether information is stale depends on the "nature of the crime and the circumstances of that case." Elbe, 774 F.3d at 889.

The Crenshaw warrant authorized a search for non-narcotic evidence of drug distribution: things such as bank records, digital devices, paraphernalia, packaging, and firearms. The information in the warrant application gives ample probable cause to believe this evidence would be located at Regalado's house on Crenshaw Boulevard even if Regalado had stopped dealing when he moved. Take the 4568 cell phone. Regalado used the 4568 cell phone to

-17-

communicate with other participants in the drug distribution ring. Given this, the cell phone likely contained evidence of Regalado's participation in the drug conspiracy. The passage of about a year and a half does not change this — "[c]omputer evidence has a particularly long life span; even after evidence is deleted by a user, it often can be recovered by law enforcement." <u>United States v. Curry</u>, 723 F. App'x 314, 317–18 (6th Cir. 2018). Geolocation data from August 2018 shows Regalado kept this cell phone in his house on Crenshaw Boulevard. There is thus a clear nexus between the 4568 cell phone and the Crenshaw house and little reason to be concerned about staleness. Likewise, Regalado kept his firearm and ammunition in his house when he lived on Lennox Boulevard. Common sense suggests Regalado would take those items with him when he moved. This creates a nexus between the evidence of Regalado's firearm possession and his Crenshaw residence. That information is not stale; "firearms are durable goods and might well be expected to remain in a criminal's possession for a long period of time[.]" <u>United States v. Goodwin</u>, 552 F. App'x 541, 545 (6th Cir. 2014) (internal alterations omitted). Similar reasoning justifies the conclusion that other non-narcotic evidence of drug distribution would be found at Regalado's Crenshaw house even if he had stopped his drug dealing activities.

  In any event, the information in the warrant application

establishes probable cause to believe Regalado had not ceased his drug dealing activities. Regalado traveled to Memphis to attempt to collect money from Named Informant One to pay a drug debt owed to Regalado's supplier in April 2018. This demonstrates Regalado's continued involvement in drug trafficking. The affidavit establishes probable cause that Regalado was a major player in the drug conspiracy in 2017 — he trafficked pound-quantities of almost pure crystal methamphetamine to buyers from halfway across the country. Before his 2017 deals with Named Informants One and Two, Regalado was investigated by the DEA from 2013 to 2016, which resulted in the seizure of a multi-kilogram quantity of cocaine and multi-pound quantity of methamphetamine. When a defendant is a "major player[] in a large, ongoing drug trafficking operation," the nexus requirement is considerably relaxed. United States v. Brown, 828 F.3d 375, 384 n.2 (6th Cir. 2016). Furthermore, "probable cause generally exists to search for the fruits and instrumentalities of criminal activity at the residence of a drug dealer with continual and ongoing operations." United States v. McCoy, 905 F.3d 409, 417 (6th Cir. 2018) (internal citations and quotations omitted). The items sought by the Crenshaw warrant — firearms, bank records, other cell phones — are the kinds of items a major player in a drug trafficking ring would likely keep in his or her house. Regalado's April 2018 attempt to collect drug debts

on behalf of his supplier shows his involvement in large-scale dealing did not end when he moved. The Crenshaw warrant was supported by a sufficient nexus and was not based on stale information. It is recommended that the motion to suppress be denied.

### III. RECOMMENDATION

For these reasons, it is recommended that the motion to sever and the motion to suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

March 6, 2020
Date

**NOTICE**

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**